UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| KEVIN HARRIS, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:09-cv-44-RLY-WGH |
| | ) | |
| WARRICK COUNTY SHERIFF'S | ) | |
| DEPARTMENT, | ) | |
|     Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Kevin Harris ("Plaintiff"), is a former employee of the Warrick County Sheriff's Department (the "WCSD"). Plaintiff alleges that his termination as a probationary deputy sheriff was based on his race, African-American, in violation of 42 U.S.C. § 1981 ("Section 1981") and 42 U.S.C. § 2000e *et seq.* ("Title VII"). WCSD now moves for summary judgment. For the reasons set forth below, the court **GRANTS** WCSD's motion.

**I. Facts**

    **A. Background**

1. In November 2003, Plaintiff began his association with WCSD when he was selected by Sheriff Marvin Heilman ("Sheriff" or "Sheriff Heilman") as a reserve deputy sheriff. (Deposition of Kevin Harris ("Plaintiff Dep.") at 19-20).

2. In late 2006, Plaintiff became a part time dispatcher. (*Id.* at 30; Deposition of

1

Marvin Heilman ("Heilman Dep.") at 21). A few months later, Plaintiff was hired as a full time dispatcher. (Plaintiff Dep. at 34; Heilman Dep. at 21).

### B. Plaintiff Is Hired as a Deputy Sheriff

3. Pursuant to Indiana Code § 36-8-10-10(b), selection of police officers for the sheriff's department is based on a merit system. Applications for the position of deputy sheriff are taken by the WCSD during odd numbered years. (Heilman Dep. at 10).

4. Applicants are asked to pass a physical agility test. (*Id.*). Those that pass are then required to sit for a written examination administered by an outside company. (*Id.*). The top 25 are then interviewed by the Sheriff's Merit Board and given a score. (*Id.* at 11). The applicants are then interviewed by the Sheriff and given a score. (*Id.*). A list consisting of the applicants with the top 15 scores is approved by the Merit Board and the Sheriff can then recommend anyone on that list for hire. (*Id.* at 13).

5. Plaintiff applied for a deputy position in 2005, but did not score well enough on the written test to make the cut for interviews. (Plaintiff Dep. at 36-37).

6. Plaintiff re-applied in 2007 and made the cut to the interview process. (*Id.* at 37).

7. Following the interview process, Plaintiff accumulated a sufficient score to place him on the hire list approved by the merit board. (Plaintiff's Ex. 3).

8. When a position came open in August of 2007, Sheriff Heilman met with his command staff, Chief Deputy Kruse, Lt. Irvin, and Lt. Weinzapfel, and they

unanimously agreed that Plaintiff should be given the opportunity for the position. (Heilman Dep. at 21).

9. Following approval by the Merit Board, Plaintiff was sworn in as a deputy sheriff on August 17, 2007. (*Id*. at 22; Plaintiff Dep. at 38).

10. On August 29, 2007, Lt. Weinzapfel sent an email message to Plaintiff and to Deputy Busing, another new deputy, advising them that their copies of WCSD's Standard Operating Procedures ("SOPs") were in the squad room. Lt. Weinzapfel requested that the deputies pick them up and become familiar with them. (Plaintiff's Ex. 32).

11. Plaintiff acknowledges receiving the email, but does not know if he picked up his copy as directed, how he received a copy, or when he received a copy. (Plaintiff Dep. at 48).

### C. The Probationary Period

12. Every new deputy has a one year probationary period during which he can be discharged at the Sheriff's discretion. (Heilman Dep. at 38).

13. The training for a newly hired deputy consists of temporary assignments so that he would become familiar with the working of the department and at least three (3) or four (4) rotations, wherein the novice would accompany a field training officer, learning the basic law enforcement techniques required to be an effective officer. (*Id*. at 23; Deposition of Paul Weinzapfel ("Weinzapfel Dep.") at 13).

14. The amount of training given varies and depends on the progress of the officer.

(Weinzapfel Dep. at 14).

15. In addition, the officer is required to attend the Indiana Law Enforcement Training Academy during his first year of employment. (Heilman Dep. at 23).

16. During Plaintiff's training, he had many of the same problems new officers experience, such as knowing the exact location of an incident, report writing, and officer safety issues. Sheriff Heilman believed that those issues would improve over time with additional training. (*Id.* at 52-53).

### D. Events Leading to Plaintiff's Termination

17. Shortly after Plaintiff's termination in January 2008, Lt. Weinzapfel, who is the liaison between the field training officers and Sheriff Heilman, summarized the concerns that lead to Plaintiff's termination in a memorandum, which is in evidence as Plaintiff's Exhibit 9. (Weinzapfel Dep. at 21, 35-36; Plaintiff's Ex. 9). Those concerns are addressed below.

#### a. Request for Sick Days

18. On September 15, 2007, Plaintiff spoke to Officer Barnett, his field training officer at the time, about the procedure for taking a sick day. (Plaintiff Dep. at 43). He said his head was hurting and that he was feeling tired. (*Id.*).

19. Officer Barnett informed him that in order to take a sick day, "you've got to be sick," but that at the time that Plaintiff asked him about the policy, he "didn't act sick." (Deposition of Richard Barnett ("Barnett Dep.") at 16-17).

20. The following day, Plaintiff called the WCSD to take a sick day. (Plaintiff's Ex. 9

4

at 2).

21. Lt. Weinzapfel had a conversation with Plaintiff about Plaintiff's sick day upon his return. (Plaintiff's Ex. 9 at 2). According to Lt. Weinzapfel, Plaintiff explained that he was tired due to the fact he was in the midst of opening a hair salon. (*Id.*).

22. In his deposition, Plaintiff testified that he did not remember whether he discussed the reason for his sick day with Lt. Weinzapfel. (Plaintiff Dep. at 45-46).

23. In Plaintiff's later-filed affidavit, Plaintiff testified that he was sick and feeling poorly due to his switch from an eight (8) hour second shift position to a twelve (12) hour third-shift/swing-shift position. (Affidavit of Kevin Harris ¶ 7).

### b. 40 Traffic Contacts Requirement

24. Soon thereafter, Plaintiff had a conversation with Sgt. Flowers during which Plaintiff inquired whether the department was serious about its requirement that an officer have forty (40) traffic contacts per month. (Plaintiff's Ex. 9 at 2).

25. Plaintiff testified that he merely wanted to know if it was mandatory and whether any discipline would arise for the failure to meet the standard. (Plaintiff Dep. at 51).

26. Lt. Weinzapfel was concerned that Plaintiff was "questioning an order like it was a suggestion and that as a probationary officer he was already trying to get out of work." (Plaintiff's Ex. 9 at 2).

27. Plaintiff, however, led the WCSD/Night-Shift in traffic contacts for the month of December 2007. (Plaintiff's Ex. F; Weinzapfel Dep. at 52, 53).

### c. Non-Issue Lights

28. After his first rotation, Plaintiff was assigned to the detectives. (Plaintiff's Ex. 9 at 3).

29. On October 2, 2007, Lt. Weinzapfel noticed that Plaintiff had installed non-issue lights in his windshield and rear deck of his assigned patrol car. (*Id*.; Weinzapfel Dep. at 30; Plaintiff Dep. at 55).

30. Lt. Weinzapfel asked Plaintiff who had given him permission to install non-issue lights on his patrol car, and Plaintiff replied that he did not know that he needed permission. (Plaintiff's Ex. 9 at 3; Plaintiff Dep. at 57).

31. Lt. Weinzapfel memorialized the counseling in a document known as an Employee Counseling Form, noting that the use of non-issue lights was a violation of SOP # 140. (Plaintiff's Ex. 8).

### d. Request to Check the Wiring on Plaintiff's Patrol Vehicle

32. Lt. Weinzapfel told Plaintiff he could keep the lights on his patrol car with the stipulation that he take the patrol car to Wagner's Fleet to have the wiring checked out. (Plaintiff's Ex. 9 at 3; Plaintiff Dep. at 59).

33. As will be seen below, Plaintiff "never got around to doing it." (Plaintiff Dep. at 59).

### e. The "Sheriff" Patch

34. Sometime later, Plaintiff was with detectives at a drowning investigation. Plaintiff wore a jacket with a patch that said "Sheriff" on the back. (*Id*. at 60-61).

35. Lt. Weinzapfel asked Plaintiff whether he had gotten permission to alter the uniform jacket with the patch. (*Id.*).

36. Plaintiff advised Lt. Weinzapfel that he had made the alteration prior to their previous discussion about the lights on the vehicle. (Weinzapfel Dep. at 47).

37. Plaintiff was told to read the SOP manual. Plaintiff testified that after this incident, he "flipped through" the manual. (Plaintiff Dep. at 62, 63).

### f. Plaintiff's Preferred Assignment

38. At some point during this time frame, Plaintiff decided that he preferred the assignment to the Judicial Center because it involved regular Monday through Friday day time hours. (*Id.* at 72).

39. Plaintiff made the request to Lt. Weinzapfel in the form of a shift preference request. (*Id.* at 71).

40. Sheriff Heilman was disappointed that Plaintiff chose the position of courtroom deputy over the other available positions, as he considered the assignment a retirement position. (Heilman Dep. at 55).

### g. Meeting with Plaintiff

41. In late October 2007, Plaintiff was called in for a meeting with the command staff consisting of Sheriff Heilman, Chief Deputy Kruse, and two lieutenants. At the meeting, Sheriff Heilman advised Plaintiff that law enforcement was not a career for everyone. (Plaintiff's Ex. 9 at 5; Plaintiff Dep. at 77; Weinzapfel Dep. at 41).

42. Plaintiff testified that the Sheriff expressed his disappointment over Plaintiff's

request to be assigned to the Judicial Center. (Plaintiff Dep. at 75).

43. Lt. Weinzapfel testified that there was a discussion about Plaintiff's lack of performance and failure to obey orders. (Weinzapfel Dep. at 41; Plaintiff's Ex. 9 at 5).

44. At the end of the meeting, Plaintiff expressed his desire to be a deputy and indicated that he would do whatever it took to accomplish that goal. (Plaintiff's Ex. 9 at 5; Plaintiff Dep. at 77; Heilman Dep. at 59).

      **h.**     **Other Issues**

45. Subsequent to the meeting, Lt. Weinzapfel noticed that Plaintiff's patrol car was parked at a local gym. (Plaintiff's Ex. 9 at 5). When the car was issued to Plaintiff, he was told that it was only for travel to and from work, or, as Plaintiff understood it, for work related activity. (*Id.*; Plaintiff Dep. at 79).

46. Plaintiff also had further problems with the wiring in his patrol car. (Plaintiff's Ex. 9 at 6; Plaintiff Dep. at 80-81).

47. At that time, Lt. Weinzapfel discovered that Plaintiff had not taken the car to Wagner's Fleet to have the wiring checked out as he had previously been ordered to do. (Plaintiff's Ex. 9 at 6; Plaintiff Dep. at 82).

48. Lt. Weinzapfel had another meeting with Plaintiff where Plaintiff sat in Lt. Weinzapfel's car and the two talked. There is a dispute over what was said. The parties agree, however, that as a result of the meeting, Plaintiff was deprived of his take home car for a month. (Plaintiff's Ex. 9 at 6; Plaintiff Dep. at 83).

49. On December 26, 2007, Chief Deputy Kruse sent Plaintiff an email ordering him to have his car available at 4:00 a.m. on January 2, 2008, for use by a WCSD officer to transport a prisoner to Plainfield, Indiana. (Plaintiff's Ex. 15). Plaintiff did not leave the car as ordered. (Plaintiff Dep. at 86). When asked by Lt. Weinzapfel if he had received the email, he said he had, but that his failure to have the car available as ordered was "just an oversight." (*Id.*).

      i.    **Plaintiff Is Terminated**

50. The command staff met concerning the future of Plaintiff. By unanimous consent, they determined that he should be terminated effective January 4, 2008. (Heilman Dep. at 137, 146-47).

51. Plaintiff was called into the meeting and advised that he was terminated due to "violations of command orders and SOPS and some issues about performance." (Heilman Dep. at 137). Sheriff Heilman testified that "the issues of performance [were] minimal with respect to his termination compared to the violation of direct orders and violation of SOPs." (*Id.*).

52. Plaintiff was offered the opportunity to either resign or be terminated. (*Id.* at 138).

53. After going home and speaking with his wife, parents, and attorney, Plaintiff returned to the Sheriff's department and requested a letter of termination. (Plaintiff Dep. at 90-91; Plaintiff's Ex. 31).

54. Officer Wessel, Plaintiff's training officer at the time of his termination, testified that he thought that Plaintiff would have made a good deputy sheriff. (Deposition

of Brian Wessel at 16).

### E. Plaintiff's Working Environment

55. Officer Wessel testified that he referred to Plaintiff as "Calvin." Officer Wessel thought that "Calvin" referred to a cartoon, but later found out it referred to an African-American from a McDonald's commercial. (*Id.* at 16-17).

56. Officer Barnett referred to Plaintiff as "Erkel." Officer Barnett explained that "Erkel" is a "nerdy" African-American character on a television show. (Barnett Dep. at 31).

57. Plaintiff testified that some of the detectives watched excerpts of the movie "Blazing Saddles." (Plaintiff Dep. at 104). Plaintiff thought the movie was "racially motivated." (*Id.* at 107).

58. Officer Claridge testified that he heard "the occasional off-colored joke from time to time, but nothing that I can specifically recall or from any specific person." (Deposition of Matthew Claridge ("Claridge Dep.") at 31).

59. Lt. Weinzapfel testified that, after Plaintiff was terminated, he "heard" that Plaintiff was called Erkel, Cowboy Troy, and/or Tubbs. (Weinzapfel Dep. at 94).

60. Sheriff Heilman testified that prior to this lawsuit, he had never heard any of his employees make racist comments or jokes. (Heilman dep. at 132-33).

61. Plaintiff did not report any of these incidents "because [he] didn't want to ruffle any feathers because I enjoyed my job and I liked it." (Plaintiff Dep. at 108).

10

### F. Plaintiff's Comparators

62. Plaintiff points to Officers Young, Claridge, and Bullock as his comparators.

63. Lt. Weinzapfel recalls that his "issue" with Officer Young was the fact that Officer Young was not "a real safe driver." (Weinzapfel Dep. at 16). For example, Lt. Weinzapfel was in the patrol car with Officer Young, and Officer Young almost rolled the vehicle. (Plaintiff's Ex. O at 7).

64. Despite his training flaws, Lt. Weinzapfel thought that, "with a little extra training," Officer Young would make a "fine officer." He noted that when he told him to do something, he did it "without question." (*Id*. at 1).

65. Officer Claridge had issues with performing traffic stops and prisoner control. (Plaintiff's Ex. Q at 2, 6). In addition, Officer Claridge almost "let a DUI suspect drive away from an accident scene," and, on another occasion, he almost caused a wreck when he pulled out in front of another vehicle. (Plaintiff's Ex. Q at 8, 10).

66. Officer Claridge's training was extended twice. (Plaintiff's Ex. R; Wessel Dep. at 18). Officer Wessel thought that Officer Claridge needed to be "more aggressive" and more decisive. (Plaintiff's Ex. Q at 12).

67. Officer Bullock replaced Plaintiff. (Weinzapfel Dep. at 87; Heilman Dep. at 49, 119).

68. Officer Todisco was Officer Bullock's field training officer from April 23, 2008, through September 7, 2008. (Deposition of Tony Todisco ("Todisco Dep.") at 12; Plaintiff's Ex. T).

11

69. In an email dated September 7, 2008, Officer Todisco noted that Officer Bullock "is still struggling with some decision making, location and orientation, and taking HOURS, and HOURS and HOURS on reports." (Plaintiff's Ex. U).

70. Lt. Weinzapfel considered terminating Officer Bullock, but then decided to extend his training. (Weinzapfel Dep. at 86).

71. During Officer Bullock's training period, he was involved in three accidents. (Heilman Dep. at 129; Bullock Dep. at 19-22).

72. After his probationary period, Officer Bullock was involved in an accident where he was in excess of the posted speed limit and hit a civilian vehicle. Officer Bullock received a written reprimand. (Plaintiff's Ex. W).

## II. Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if it is outcome determinative. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "genuine" where the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 264 (7th Cir.

1996). While the moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-moving party may not simply rest on the pleadings, but "must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial." *Id*. If the non-moving party fails to make a sufficient showing on an issue to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Ripberger v. W. Ohio Pizza, Inc.*, 908 F.Supp. 614, 617 (S.D. Ind. 1995) (citing *Celotex Corp.*, 477 U.S. at 323).

## III. Discussion

Plaintiff brings his race discrimination claim under both Section 1981 and Title VII. Claims of discrimination brought under those statutory sections are analyzed under the same methods of proof. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 940 (7th Cir. 1996). Here, Plaintiff proceeds under the direct, as opposed to the indirect, method of proof.

The direct method of proof requires a plaintiff to show, either through direct or circumstantial evidence, that the employer's decision to take the adverse job action was motivated by an impermissible purpose such as race. *Henry v. Jones*, 507 F.3d 558, 566 (7th Cir. 2007); *Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998). "Although labeled the 'direct' method of proof, this method 'is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (e.g., 'You're too old to work here.'), but also includes circumstantial evidence which suggests discrimination

13

albeit through a longer chain of inferences.'" *Id.* (quoting *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006)). A plaintiff proceeding under the direct method of proof may rely on direct evidence, a "convincing mosaic" of circumstantial evidence, or a combination of the two. *Id.* (citing *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007); *Davis v. Con-Way Transp. Cent. Exp., Inc.*, 368 F.3d 776, 786 (7th Cir. 2004) (citing *Volovsek v. Wisconsin Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 689-90 (7th Cir. 2003) (defining direct evidence as "an admission of intentional discrimination or a 'mosaic' of circumstantial evidence that points directly to a discriminatory intent"). Circumstantial evidence of intentional discrimination may include: "'(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.'" *Henry*, 507 F.3d at 566 (quoting *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007)).

    **A.    Ambiguous Written or Oral Statements**

Plaintiff contends he worked in a racially charged environment, full of racially inappropriate nicknames, jokes, and movie viewing. By Plaintiff's own account, however, the nicknames chosen for Plaintiff are rather innocuous. Erkle is a "nerdy" character on a now-cancelled television show, and Calvin is/was a character on a

14

commercial for McDonald's Corporation. (Plaintiff does not identify who Cowboy Troy and Tubbs are, and thus, the court is unable to make a meaningful analysis with regard to these nicknames). In short, there is no evidence that these nicknames were chosen for the Plaintiff in an effort to demean and/or harass Plaintiff based upon his race. The most that can be said of these characters is that they happen to be African-American.

Plaintiff's evidence with regard to racially inappropriate jokes is even less convincing. Plaintiff complains that off-color jokes were "routinely made at WCSD." (Response Brief at 6). In support of that statement, Plaintiff relies on the testimony of Officer Claridge. Officer Claridge testified, however, that he "heard the occasional off-colored joke from time to time, but nothing that [he] could specifically recall or from any specific person." (Claridge Dep. at 31).

Plaintiff also complains that on one occasion, he happened to notice that some WCSD officers were watching excerpts of the movie "Blazing Saddles." Plaintiff testified that he thought the movie was racially motivated, but does not give specific statements or segments from the movie to support that view. Without more, the court cannot say that watching excerpts of a movie that was nominated for three Academy Awards is evidence that those who made the decision to fire him did so with discriminatory intent.

More importantly, and as just noted, Plaintiff must show that this racially charged atmosphere is evidence that the decision makers in this case – Sheriff Heilman, Chief Deputy Kruse, Lt. Irvin, and Lt. Weinzapfel – made the decision to terminate Plaintiff's

employment due to his race. Neither Sheriff Heilman nor Lt. Weinzapfel were even aware of the nicknames or the film viewing. (Heilman Dep. at 132-35, 145-46; Weinzapfel Dep. at 93-94). Thus, there is no evidence from which a jury could infer that Plaintiff's nicknames or his co-workers' film viewing had anything to do with the employment decision at issue. *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 611 (7th Cir. 2001) (quoting *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000) (alleged discriminatory remarks must be "causally related to the adverse employment action at issue")); *Hong. v Children's Mem. Hosp.*, 993 F.2d 1257, 1266 (7th Cir. 1993) (finding that evidence of "occasional or sporadic use of a slur directed at an employees' race . . . when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements were uttered by a decision maker."). Consequently, Plaintiff's evidence adds nothing to the "mosaic" Plaintiff is attempting to construct.

### B. Similarly Situated Employees

Plaintiff also contends that he was treated differently than similarly situated Caucasian deputies in the training program. In *Radue v. Kimberly-Clark Corp.*, the Seventh Circuit held that in disciplinary cases such as this, where a plaintiff claims he was disciplined more harshly than a similarly-situated employee based on some illegitimate reason:

> [the] plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the

16

> same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

219 F.3d 612, 617-18 (7th Cir. 2000) (internal citation omitted). The court's inquiry is a "flexible one" that considers "'all relevant factors, the number of which depends on the context of the case.'" *Humphries v. CBOS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (quoting *Radue*, 219 F.3d at 617). "As to relevant factors, an employee need not show complete identity in comparing himself to a similarly situated employee, but he must show substantial similarity." *Id.* at 405 (quoting *Radue*, 219 F.3d at 618).

In the words of Sheriff Heilman, Plaintiff was terminated due to "violations of command orders and SOPs and some issues of performance" with the "issues of performance being minimal with respect to his termination compared to the violation of direct orders and SOPs." (Heilman Dep. at 137). Plaintiff's comparators – Officer Young, Officer Claridge, and Officer Bullock – were never accused of violating SOPs or disobeying orders. (Young Dep. at 25; Claridge Dep. at 30; Bullock Dep. at 57-58). The closest conduct to which Plaintiff can point is a single incident wherein Officer Bullock received a written reprimand after being involved in an accident while responding to a call for aid from another officer. He was alleged to have violated state law, and the rules of the WCSD. (Plaintiff's Ex. W). However, at the time of the accident, Officer Bullock was past his probationary period and was a full merit deputy sheriff. (Weinzapfel Dep. at 97). Consequently, Officer Bullock was not "similarly situated" to Plaintiff in terms of employment status.

17

## C. The Employment Decision

Plaintiff contends that the command staff's reason for terminating him – i.e., for violating orders and SOPs – is a pretext for discrimination. A pretext is a "'lie, specifically a phony reason for some action.'" *Paul v. Theda Medical Ctr., Inc.*, 465 F.3d 790, 794 (7th Cir. 2006) (quoting *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999)).

First, Plaintiff accuses WCSD of "shifting" its reasons for the challenged conduct, thus rendering the explanation unworthy of belief. Specifically, in the WCDS's submission to the Department of Workforce Development disputing Plaintiff's claim for unemployment benefits, WCSD gave five (5) reasons for his termination: (1) failing to leave his vehicle for prisoner transport; (2) having non-issue lights on his vehicle; (3) failing to have the lights inspected; (4) adding an unapproved "Sheriff" patch to his jacket; and (5) conducting personal business while on duty. (Plaintiff's Ex. X). In its position statement to the EEOC, the WCSD gave nine (9) reasons for his termination, which are consistent with the reasons given in this motion. The additional reasons included: (1) his request for a sick day, (2) the fact that he inquired about the minimum number of traffic contacts per month a deputy was expected to make; (3) he drove his patrol car to a local gym; and (4) he requested courtroom deputy duty as a shift preference; and (5) he questioned the "40 traffic contacts" requirement. (Plaintiff's Ex. Y).

The differences in the reasons advanced by the WCSD are not material. In the

EEOC statement, the WCSD included background information and descriptions of events that raised concerns (the five (5) incidents listed above), but the reasons for the actual decision to terminate Plaintiff remained the same – failure to follow orders and SOPs.

Second, Plaintiff argues that many of the violations are "insubstantial" and provide no legitimate basis for the termination of a probationary employee. Yet, the failure to follow orders and SOPs can have substantial consequences. SOPs are adopted to protect the public from possible constitutional violations or safety hazards, as well as to protect the governmental unit from liability. An officer's failure to become familiar with the SOPs or merely refusing to abide by them could potentially result in severe consequences. Thus, the fact that the command staff made the determination that Plaintiff, as a probationary employee, should be terminated for failing to follow orders and SOPs, is a legitimate reason to terminate Plaintiff.

Finally, while not dispositive, it must be remembered that Sheriff Heilman, with the advice of his command staff, made the decision to hire Plaintiff as a deputy. In fact, Sheriff Heilman hired Harris on four different occasions, first as a reserve deputy, then as a part time dispatcher, then as a full time dispatcher, and finally as a deputy sheriff. *Martino v. MCI Commc'n Servs., Inc.*, 574 F.3d 447, 454-55 (7th Cir. 2009); *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620 (7th Cir. 2006). Common sense dictates that a person who hires an individual four times does not suddenly and inexplicitly develop a strong bias against that individual because of his race. The Seventh Circuit has recognized a rebuttable inference of non-discrimination in such instances. *E.E.O.C. v.*

*Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir. 1996) ("The same hirer/firer inference has a strong presumptive value.").

For the reasons set forth above, the court finds that no genuine issue of material fact exists on Plaintiff's Section 1981 and Title VII claims for race discrimination. Accordingly, the court **GRANTS** the WCSD's motion for summary judgment.

### IV. Conclusion

For the reasons set forth above, the court **GRANTS** the Defendant's Motion for Summary Judgment (Docket # 29).

**SO ORDERED** this  28th  day of October 2010.

_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Kyle Frederick Biesecker
BIESECKER & DUTKANYCH LLC
kfb@bdlegal.com

Ronald J. Semler
STEPHENSON MOROW & SEMLER
rsemler@stephlaw.com

Douglas A. Welp
BAMBERGER FOREMAN OSWALD & HAHN
dwelp@bamberger.com